**William GEORGE, Kristna George and Amanda George, Plaintiffs–Respondents,**

v.

**HOWARD CONSTRUCTION COMPANY, Defendant–Appellant.**

No. KCD 30499.

Missouri Court of Appeals, Western District.

Aug. 4, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 2, 1980.

Roy A. Larson, Thomas R. Larson, Morris, Larson, King, Stamper & Bold, Kansas City, for defendant–appellant.

William J. Cason, Michael X. Edgett, Fred R. Bunch, Clinton, for plaintiffs–respondents.

Before CLARK, P. J., and SOMERVILLE and TURNAGE, JJ.

SOMERVILLE, Judge.

William George, joined by the surviving minor children born of his marriage to Barbara Frances George (decedent), filed suit against Howard Construction Company (Howard) for the wrongful death of the wife and mother who was killed on May 20, 1977, in a head–on collision with an oncoming automobile on Missouri State Highway 52 at a point approximately a mile and a half east of Calhoun, Missouri.

Trial of the case commenced on June 12, 1978, and on June 13, 1978, nine jurors returned a verdict in favor of plaintiffs and against Howard and assessed damages in the amount of $125,000.00. Judgment was entered accordingly and Howard appealed after an unsuccessful motion for judgment in accordance with its motion for a directed verdict at the close of all the evidence or, in the alternative, for a new trial.

A wide ranging array of issues has been raised by Howard on appeal: (1) the trial court erred in failing to sustain Howard's motion for a directed verdict at the close of all the evidence because as a matter of law its alleged failure to warn decedent that a "soft and low" shoulder adjacent to her side of the traveled portion of the highway exposed her to danger was not the proximate cause of her fatal injuries; (2) the trial court erred in failing to sustain Howard's motion for a directed verdict at the close of all the evidence because as a matter of law it had no duty to warn decedent since she knew and was aware of the alleged dangerous condition charged; (3) the trial court erred in failing to sustain Howard's motion for a directed verdict at the close of all the evidence because decedent was guilty of contributory negligence as a matter of law; (4) the trial court erred in giving Instruction No. II, plaintiffs' verdict director, because said instruction was prejudicially erroneous in that it deviated from an applicable MAI instruction by interpolating the word "adequately" between the words "to warn", and, furthermore, because the "tail" negating Howard's instruction submitting decedent's contributory negligence instruction was not set off in a separate paragraph; (5) the trial court abused its discretion in permitting plaintiffs' counsel on voir dire to inquire as to whether any members of the jury panel were policyholders of Howard's insurance carrier since it was a stock company; and (6) the trial court's refusal to declare a mistrial by reason of plaintiffs' counsel's reference on voir dire to Howard's insurance carrier as a "liability insurance company", and an untimely approach to the bench by plaintiffs' counsel, constituted an abuse of discretion.

The facts will be set forth in conformity with certain basic principles brought into play by reason of the tenor of points (1), (2) and (3). First, appellate review of the trial court's denial of Howard's motion for a directed verdict at the close of all the evidence requires looking at all the evidence, and all reasonable inferences therefrom, in the light most favorable to plaintiffs, giving them the benefit of all favorable evidence which is not contrary to their own testimony, and disregarding any unfavorable evidence of Howard. *Willis v. Wabash Railroad Company*, 284 S.W.2d 503, 506 (Mo.1955); and *Carter v. Boys' Club of Greater Kansas City*, 552 S.W.2d 327, 329 (Mo.App.1977). Second, as clearly put in *Guthrie v. City of St. Charles*, 347 Mo. 1175, 152 S.W.2d 91, 95 (banc 1941), appellate

review parallels the charge or charges of negligence finally submitted to the jury, notwithstanding the fact that others may have been pleaded and evidence existed to justify their submission: "When the defendant in his motion for new trial and on appeal renews his exceptions to the overruling of his demurrer to the evidence, it must be understood by everyone that the complaint is directed to the assignments still in the case. Whether the others were supported by substantial evidence has become a moot question. The plaintiff has waived his rights under them. Appellate courts should not be required to search the whole record to find out whether the demurrer was properly overruled because there was evidence sustaining some assignment afterwards discarded. Neither should they be compelled to affirm the judgment on such purely technical grounds when there is no evidence to support it." In conjunction herewith, Instruction No. II, plaintiffs' verdict director, more about which will be said later, reads as follows:

#### "INSTRUCTION NO. II

Your verdict must be for plaintiffs if you believe:

First, plaintiff William George was the lawful husband of Barbara Frances George at the time of her death and that Kristina George and Amanda George were her only children at the time of her death, and

Second, defendant created a soft and low shoulder of the highway close to the highway, and

Third, that such soft and low shoulder of the highway was so close to the public highway that persons using the highway in the exercise of the highest degree of care were exposed to a danger of driving into the soft and low shoulder, and

Fourth, defendant knew or should have known of such danger, and

Fifth, defendant failed to use ordinary care to adequately warn of it, and

Sixth, as a direct result of such failure Barbara Frances George died, unless you believe plaintiffs are not entitled to recover by reason of Instruction Number V."

Third, appellate determination of whether decedent was guilty of contributory negligence as a matter of law as charged by Howard entails looking at the evidence in the same context it is looked at in conjunction with points (1) and (2). *Zumault v. Wabash Railroad Company*, 302 S.W.2d 861, 863 (Mo.1957); and *Carter v. Boys' Club of Greater Kansas City, supra.*

With the above perspective of the evidence in mind, the following statement of facts is justified. Between April 5, 1977, and July 20, 1977, Howard, pursuant to a contract with the State of Missouri, was engaged in repairing Missouri State Highway 52 between Clinton and Windsor, Missouri. Calhoun, Missouri, is located between the two. The project consisted of applying an asphalt overlay over the old road surface and stabilizing and shaping the shoulders. The construction proceeded in sequential stages throughout various station points. First, a road grader was used to scrape the grass and some of the dirt from the shoulders adjacent to the traveled portion of the highway; second, an asphalt overlay was then applied to the old road surface; third, a motor grader back filled the loose dirt on the shoulder along the edges of the road surface and compacted it with one of its rear wheels; and fourth, a motor grader regraded the shoulders and gravel was placed on them to build them up to the level of the new road surface.

On Wednesday, May 18, 1977, two days before the fatal accident, the first three stages of construction had been completed by Howard in the general area east of Calhoun, Missouri. However, the fourth and final stage had not been undertaken and Howard had moved its men and equipment to another station point west of Calhoun, Missouri.

The fatal accident occurred at approximately 7:45 A.M. on Friday, May 20, 1977. In the area where the accident occurred, Missouri State Highway 52, with reference to traffic proceeding in an easterly direction as was the decedent, curves rather

sharply to the left. It is a "banked" curve and the right shoulder is on the high side of the curve. On Monday, May 16, 1977, four days before the fatal accident, it rained causing a "clay wash" to seep across the traveled portion of the highway in the area of the curve. It also rained at approximately 5:00 A.M. on the morning of the fatal accident, again causing a "clay wash" to seep across the traveled portion of the highway in the area of the curve. The "clay washes" which seeped across the traveled portion of the highway on the occasions mentioned occurred after the right shoulder had been disrupted and torn up by Howard during the construction process. The color of the "clay washes" was such that they were virtually indiscernible to the naked eye and the drivers of motor vehicles first became aware of them after they got onto them. Upon doing so, they could be "felt" because they were "slippery".

On the morning in question the right shoulder on the curve, with reference to the level of the traveled portion of the highway as built up by the asphalt overlay, varied in depth immediately adjacent to the traveled portion of the highway from approximately six inches to one and a half inches. The right shoulder was also "very soft" at the time. The real extent and nature of the low, soft condition of the right shoulder in the area of the curve was not readily discernible to persons driving along in an automobile. Its true condition was ascertainable by persons on foot at the site. Howard's asphalt plant and field headquarters were situated approximately one hundred and fifty yards from the curve and complaints had been made to Howard's supervisory personnel about the lack of warning signs and the fact that dirt was not being pulled up to prevent low shoulders.

On the day of the fatal accident there were no signs of any kind posted on Missouri State Highway 52 in the area or vicinity of the curve. More particularly there were no signs of any kind posted on Missouri State Highway 52 for eastbound traffic from Calhoun, Missouri, to a point considerably east of the curve.

In accordance with the terms of its contract with the State of Missouri, Howard was required to post certain warning signs and place delineators (reflector sticks) along Missouri State Highway 52 where the shoulders were low or soft throughout the course of the construction project to alert motorists as to the hazardous road conditions. An expert witness called by the plaintiffs testified that Howard, in accordance with the specifications contained in Howard's contract with the State of Missouri, as well as standards promulgated by the Department of Transportation, the National Safety Council, and the American National Standards Institute, in view of the conditions that existed at the time, should have posted the following signs in the following sequence for the benefit of motorists traveling east and approaching the curve.[1] At least 1500 feet west of the low, soft shoulder a "road construction ahead" sign should have been posted, followed by a "reduced speed ahead" sign at an interval of 500 feet, followed by a "40 MPH" sign at an interval of 500 feet, and followed by "low shoulder" and "soft shoulder" signs at an interval of 500 feet. Additionally, a "slippery when wet" sign should have been posted. The aforementioned speed limit signs should have been repeated every half mile throughout the length of the hazard and the "low shoulder" and "soft shoulder" signs should have been repeated at thousand foot intervals throughout the length of the hazard. Moreover, delineators (reflector sticks) should have been erected every 100 feet throughout the course of the low, soft shoulder to mark the edge of the traveled portion of the highway.

On the morning of Friday, May 20, 1977, decedent, accompanied by her two minor

---

1. Although the standard of care owed by Howard to the traveling public was not fixed by the terms of its contract with the State of Missouri, the specifications contained therein as to signs were proper for the jury to consider in determining whether the standard of care imposed by law which Howard owed to the traveling public had been complied with. See *Dornack v. Barton Construction Company*, 272 Minn. 307, 137 N.W.2d 536, 544 (1965).

children, was traveling in an easterly direction on Missouri State Highway 52. She had left her home in Calhoun, Missouri, to take her children to her parents' home which was located a short distance east of the site of the fatal accident. Although the decedent had traveled the route in question a number of times during various phases of the construction project, she had not traveled the particular stretch of highway where the accident occurred, after construction started, following a rain. About a half of mile west of the curve the speed of decedent's automobile was estimated to be about 50 miles per hour. As decedent's car entered the curve it was traveling at a "normal highway speed", was on its side of the traveled portion of the highway, and was meeting an oncoming vehicle. The decedent's car left "wiggly marks" on its side of the traveled portion of the highway after it entered the curve and the front and back wheels on the right side then went off onto the shoulder on the right hand or high side of the curve. The front and back wheels on the left side of decedent's car stayed on the traveled portion of the highway. Decedent's car followed the course of the curve in that position out of control for a distance of approximately 22 feet at which point the wheels on the right side then came back onto the traveled portion of the highway and her car then careened at an angle across the center of the traveled portion of the highway, leaving four "scuff marks" approximately 99 feet in length, and collided with the oncoming vehicle. The shoulder was muddy and "very soft" where decedent's vehicle first left the traveled portion of the highway and was approximately 6 inches lower than the surface of the asphalt overlay at that point. The right wheels of decedent's vehicle left a "rut" six inches in depth (twelve inches below the surface of the asphalt overlay at places) on the right shoulder of the road. The shoulder firmed up somewhat at the point where the right wheels of decedent's car came back onto the traveled portion of the road and at this latter point the shoulder was only an inch and half lower than the surface of the asphalt overlay.

Lack of any causal connection between Howard's failure to warn decedent of the presence of low, soft shoulders ahead which exposed her to danger and her resultant death is the crux of Howard's first point. The argument marshaled by Howard views the evidence from a standpoint most favorable to itself and conveniently disregards viewing it most favorable to the plaintiffs. Carried along by this improper approach to the evidence, Howard argues that no amount of signs, whatsoever their kind, would have prevented decedent from leaving the traveled portion of the highway and going onto the low, soft shoulder because doing so was due to loss of control of her automobile. Howard seeks to buttress its overall position by further arguing that decedent was not oblivious to any impending perils attributable to the low, soft shoulder because its condition was plainly visible and therefore warning signs would not have alerted her to anything she didn't already know. Howard's arguments are untenable when the evidence is viewed most favorable to plaintiffs and they are given the benefit of all reasonable inferences. When decedent's car entered the curve, the oncoming vehicle which she eventually collided with was in sight. The combination of the disrupted shoulder and the recent rain caused a "clay wash" to seep across the traveled portion of the highway making it slippery, a condition which could be felt but not seen. Although this slippery condition of the highway adversely affected the operation of decedent's automobile, as evidenced by the "wiggly marks", it cannot unequivocally be said that decedent lost control of her automobile when she entered the curve. The jury could have reasonably inferred that confronted with the oncoming vehicle and the slippery condition of the highway decedent instinctively favored her right hand side of the road and got off onto the shoulder unaware of any impending peril of losing control of her automobile due to the shoulder's low, soft condition. Even though decedent may have been aware that the shoulder was wet and muddy, there were no delineators (reflector sticks) to tell her

where the traveled portion of the highway stopped and the shoulder began, nor was she aware of the six inch drop off and the fact that the shoulder was not only wet and muddy but was dangerously soft insofar as affording a safe place of escape for vehicular traffic. If Howard had posted the requisite warning signs and placed the delineators as required, decedent would have been alerted to the latent dangers to be encountered if any part of her vehicle got off onto the shoulder. One of the very purposes which the warning signs and delineators were designed to serve was defeated by Howard's negligence.

 Howard submits, and correctly so, that the test for causal connection (proximate cause) is whether the facts show that absent the charged negligence decedent's death would not have occurred, and that proof of causal connection, a burden carried by plaintiffs, cannot rest on speculation and conjecture. *James v. Sunshine Biscuits, Inc.*, 402 S.W.2d 364, 375 (Mo.1966), and cases therein cited. These tersely stated principles are not applied in a legal vacuum wholly indifferent to the function of the jury as the trier of the facts. As was said in *Pollard v. General Elevator Engineering Company*, 416 S.W.2d 90, 95 (Mo.1967), "[w]hat is proximate cause is ordinarily a jury question." If reasonable minds could differ on the question of proximate cause, then it is an issue to be determined by the jury. *McFarland v. Grau*, 305 S.W.2d 91, 101 (Mo.App.1957). Causation may be proven by circumstantial evidence, *Pollard v. General Elevator Engineering Co., supra*, 416 S.W.2d at 95, and it is sufficient if the facts proved are of such a nature and are so connected and related to each other that the existence of a causal connection may be reasonably inferred, *Shelton v. Bruner*, 449 S.W.2d 673, 680 (Mo.App.1969). Concomitantly, Howard's negligence constituted proximate cause if it was the efficient cause which set in motion the chain of circumstances leading up to decedent's demise, and the issue of a causal connection between Howard's negligence and decedent's fatal injuries is not narrowly relegated to proof that Howard could have foreseen the par-

ticular consequences that ensued from its negligence but whether, after the occurrence, the jury could find that decedent's demise was a reasonable and probable consequence of Howard's negligence. See generally: *Foley v. Hudson*, 432 S.W.2d 205, 207 (Mo.1968); *Floyd v. St. Louis Public Service Company*, 280 S.W.2d 74, 78 (Mo. 1955); *Carter v. Boys' Club of Greater Kansas City, supra*, 552 S.W.2d at 331; and *Lottes v. Pessina*, 174 S.W.2d 893, 897 (Mo. App.1943). Judicial determination of the inadequacy of evidence as a matter of law to establish proximate.cause vis-a-vis submission of the issue to the trier of facts in a given case is, admittedly, a treacherous legal shoal to cross. When encountered, constant judicial vigilance must be exercised to refrain, on the one hand, from usurping the zealously guarded prerogative of juries to determine the facts, and, on the other hand, to retain the integrity of the law by refusing to permit juries to decide such a crucial issue on nothing more than speculation and conjecture. Mistaken judgments on issues of proximate cause are "shipwrecks" of the law.

 A careful reading of cases cited by Howard in support of the first point reveals that they are factually inapposite. Experience teaches that every case involving proximate cause raises a new and different judicial challenge. Although legal principles for their resolution remain constant, the facts to which they must be wedded change from case to case in varying degree. After viewing all the evidence in the instant case in the light most favorable to plaintiffs, and giving them the benefit of all reasonable inferences, this court cannot say with conviction or certainty that plaintiffs, as a matter of law, failed to prove a causal connection between Howard's negligence and decedent's death or that the jury had to resort to speculation and conjecture to resolve the issue of proximate cause.

 Howard's second point, in reality, is a subtle variation of its first point. Howard further contends that its failure to post warning signs did not constitute ac-

tionable negligence as opposed to its previous contention that the absence of warning signs was not the proximate cause of decedent's death. The same theme, argument-wise, permeates both points—Howard had no duty to warn decedent because the condition of the shoulder was known and obvious to her and posting warning signs and delineators (reflector sticks) would have served no useful purpose. Howard cites numerous cases holding that when dangerous conditions are known by or obvious to an injured party there is no duty on the part of the wrongdoer to warn of them. See, for example, *Bohler v. National Food Stores, Inc.*, 425 S.W.2d 956, 959 (Mo.1968), *Sellens v. Christman*, 418 S.W.2d 6, 9 (Mo. 1967), and *Moore v. Kopp*, 400 S.W.2d 176, 181 (Mo.1966). Howard's second point is beset with the same inherent frailty that besets its first point. Carefully selected items of evidence have been seized upon which favor Howard, while at the same time items of evidence which favor plaintiffs have gone unmentioned. When all the evidence and all reasonable inferences therefrom are viewed in the light most favorable to plaintiffs, as they must be viewed, it cannot be said that the lurking danger presented by the low, soft shoulder was open and obvious to passing motorists and that the posting of warning signs and delineators would not have served any useful purpose. A protracted discussion of Howard's second point is unnecessary as everything previously said regarding resolution of Howard's first point applies with equal cogency and disposes of Howard's second point.

Howard's third point falls into virtually the same misconceived category as its first and second points. Howard vigorously contends that the trial court should have sustained its motion for a directed verdict at the close of all the evidence because decedent was guilty of contributory negligence as a matter of law in that she (a) failed to see what was plainly visible, (b) took her eyes off the road while in the curve, (c) drove onto the shoulder when she knew or should have known that it was low and muddy, and (d) without just cause or excuse "left the travelled portion of the highway". They were issues of fact to be resolved by the jury unless it can be said that the only conclusion that reasonable minds could draw was that decedent was guilty of contributory negligence. *Mitchell v. Buchheit*, 559 S.W.2d 528, 530 (Mo.banc 1977). Again, at the risk of being unduly repetitious, the multiple charges of contributory negligence leveled by Howard against decedent are bottomed on a view of the evidence most favorable to Howard and not from a viewpoint most favorable to the plaintiffs. The posture of the evidence as it bears on points one and two remains constant insofar as Howard's claim of contributory negligence as a matter of law is concerned. Suffice it to say, when all the evidence and all reasonable inferences therefrom are viewed in the light most favorable to plaintiffs, Howard's charge of contributory negligence as a matter of law is legally wanting. The trial court, per Howard's request, gave a contributory negligence instruction. Doing so, however, cannot be seized upon as inexorable support for Howard's present contention that decedent was guilty of contributory negligence as a matter of law. The perspective in which all the evidence must be viewed in order to sustain a finding of contributory negligence as a matter of law does not parallel the perspective in which it must be viewed in order to determine submissibility of the issue of contributory negligence to the jury.

Howard's fourth point attacks Instruction No. II, plaintiffs' verdict director, on two narrow grounds: (1) said instruction deviated from the applicable MAI instruction by insertion of the word "adequately" before the word "warn" in the fifth paragraph of said instruction; and (2) the "tail" to said verdict directing instruction negating Howard's affirmative defense of contributory negligence was not set off in a separate paragraph.

Howard perfunctorily assumes that MAI 22.02, captioned "Verdict Directing—Dangerous Conditions Near Public Thor-

oughfare", was the appropriate MAI instruction to resort to for modifying MAI 20.01, captioned "Verdict Directing–Wrongful Death–Single Negligent Act Submitted", and then proceeds to point out that the adverb "adequately" is not to be found in MAI 22.02 as a modifier of the verb "warn" contained therein. After so doing, Howard argues that insertion of the adverb "adequately" was a presumptively prejudicial deviation from MAI 22.02 and that plaintiffs cannot show that the deviation was non-prejudicial. No argument lies with respect to Howard's contention that the giving of an applicable MAI instruction is mandatory and any deviation from an applicable MAI instruction constitutes error which is presumptively deemed prejudicial unless it is made perfectly clear by the proponent of the instruction that no prejudice could have resulted. Rule 70.02(b)(c); and *Brown v. St. Louis Public Service Company*, 421 S.W.2d 255, 257, 259 (Mo. banc 1967). However, it is also judicially recognized that MAI instructions are not all encompassing and modification of MAI instructions may be appropriate under the facts of a particular case. *Brown v. St. Louis Public Service Company, supra*, 421 S.W.2d at 259; and *Turner v. Cowart*, 450 S.W.2d 441, 445 (Mo.1969).

This court believes that a genuine question exists as to whether MAI 22.02 was an applicable instruction. The case at bar was tried after the approval but before the effective date of MAI 22.08,[2] captioned "Verdict Directing–Highway Danger Created by Highway Construction Contractor (New)". MAI 22.02 which Howard claims was applicable required, for instance, a finding that "defendant [Howard] knew or should have known of such danger". New MAI 22.08 does not require such a finding. This points up a basic and fundamental difference between the requisite elements submitted by the respective instructions and augurs against Howard's contention that MAI 22.02 was indubitably an applicable instruction.

**2.** Approved April 5, 1978, effective July 1, 1978.

From every possible point of view, absent the necessity of deciding which is ultimately correct, Instruction No. II appears to fall within one or the other of two categories–non–existence of an applicable MAI instruction or the modification of rather than a deviation from MAI 22.02 because of the posture of the particular facts in this case. In either event, Rule 70.02(e) governs: "Where an MAI must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given, then such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." When an MAI instruction "must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given", it is elementary that the instruction as given must conform to the substantive law. Howard does not contend that it had no duty to warn decedent of any danger occasioned by the low, soft condition of the shoulder if such was not known by or obvious to decedent. Its position is distilled into the argument that the instruction improperly modified any failure on its part to use ordinary care to warn by inserting the adverb "adequately" between the words "to" and "warn". Countering the evidence from the point of view most favorable to plaintiff that no warning signs of any kind were posted against traffic traveling east out of Calhoun on the morning in question, was some fragmentary evidence that a single "road construction ahead" sign had been posted approximately a mile and a quarter west of the site of the accident with reference to eastbound traffic. The jury, of course, was at liberty to believe or disbelieve that one isolated sign or no signs had been posted by Howard. The real crux of the issue encompassed in Howard's failure to use ordinary care to warn decedent, comportable with the testimony of plaintiffs' expert witness, was decedent's exposure to the danger of driving off onto the soft, low

shoulder absent being "adequately" warned of such danger by a series of appropriate signs strategically located as opposed to the questionable effectiveness of a warning afforded by a single, distantly removed sign reading "road construction ahead", and modification of the verb "warn" by the adverb "adequately" was necessary to fairly submit said issue of warning in the sense relied upon by plaintiffs. Howard does not contend that doing so violated any recognized principle of substantive law. As previously mentioned, it confines its argument to the proposition that insertion of the adverb "adequately" constituted a deviation from an applicable MAI instruction (purportedly MAI 22.02) and was irrefutably rendered prejudicially erroneous. From a pragmatic standpoint, Howard's argument suggests that plaintiffs undertook a greater burden of persuasion than Howard believed was necessary. Inversely, Howard's argument also suggests that the jury should have exonerated Howard if it found that Howard posted a single sign regardless of its kind or location. Plaintiffs obviously imposed a heavier burden on themselves by proving and submitting that Howard failed to adequately warn of the danger as opposed to merely proving and submitting that Howard failed to give any warning of any kind. The case of *Kinder v. Pursley*, 488 S.W.2d 937 (Mo.App.1972), throws considerable light on the propriety of rejecting Howard's attempt to fault insertion of the adverb "adequately" in front of "warn" in plaintiffs' verdict director. In *Kinder*, the plaintiffs' theory of submission against defendant, a road contractor, was the latter's failure to "give adequate warning of [a] dangerous condition ahead", namely, the unguarded terminal point of an unfinished service road which defendant–contractor was working on. On appeal defendant–contractor questioned submissibility of the case, and faulted plaintiff's verdict directing instruction, insofar as it was cast in terms of defendant–contractor's failure to "provide adequate warning", on the ground that the jury was given a roving commission because the instruction failed to define the term "adequate warning". Regarding

the issue of submissibility, the court in *Kinder* held that under the most favorable view of the evidence from plaintiffs' standpoint, defendant–contractor "breached its duty to give plaintiffs adequate warning" of the unguarded terminal point of the unfinished road. Regarding the term "adequate warning" employed in plaintiff's verdict director, the court in *Kinder* held that the phrase "adequate warning" defines itself, thereby precluding the contention that said phrase gave the jury a roving commission. The court in *Kinder* tacitly approved the use of "adequate" as a modifier for the word "warning" in order to fairly submit the issue of warning by reason of uncontradicted evidence offered by plaintiff that the driver of the car in which she was riding saw, alongside the road, a barricade which defendant–contractor's employees testified they placed across the service road when they left work. The evidence stands uncontradicted that the accident occurred on a dark rainy night. The court in *Kinder* held that the fact that the barricade was seen alongside the road by the driver of the vehicle occupied by plaintiff did not "destroy plaintiff's case" and elaborated thereon by saying that the "jury may well have concluded that the barricade so placed on a dark, rainy night was not an adequate warning". Thus, in *Kinder* the adequacy of the warning vis–a–vis the mere giving of some type of a warning regardless of its type or location became a viable issue because of the posture of the particular evidence to be reckoned with. The same may be said in the instant case.

Howard's remaining complaint concerning Instruction No. II, plaintiffs' verdict director, is that it failed to set off in a separate paragraph the "tail" negating Howard's instruction submitting decedent's contributory negligence. Rule 70.03 provides in part that "[s]pecific objections to instructions shall be required in motions for new trial unless made at trial." Compliance with this rule in one of the two manners provided is a prerequisite for preserving an objection to an instruction for appellate review. The necessity for compliance

is reemphasized in Rule 78.07 which provides, in part, that "[a]ny specific objections to instructions which were not made at the trial before submission to the jury, must be set forth in the motion for new trial to preserve the error for review." The instant objection to Instruction No. II was neither made at the trial nor set forth in Howard's motion for new trial and therefore will not be considered on appeal. *Hanff v. St. Louis Public Service Company*, 355 S.W.2d 922, 926 (Mo.1962); and *Belter v. Crouch Brothers, Inc.*, 554 S.W.2d 562, 563 (Mo.App.1977).

Howard's fifth and sixth points are of such a kindred nature that they lend themselves to being jointly reviewed. At the outset of the trial, in chambers and out of the presence of the jury panel, plaintiffs' counsel made inquiry as to whether any insurance carrier was interested in the outcome of the litigation. Counsel for Howard responded that there was, gave the name of Howard's insurance carrier, and advised that it was a stock company. The trial judge then made inquiry of plaintiffs' counsel as to how he intended to frame any question he proposed to ask on voir dire regarding the fact that an insurance carrier was interested in the outcome of the litigation. Plaintiffs' counsel advised that he proposed to ask a single, general question, namely, whether anyone on the jury panel or any members of their families were stockholders in, employees of, or carried policies of insurance with said insurance carrier. Howard's counsel lodged an objection to that portion of the proposed question making inquiry as to policyholders of said insurance carrier. Notwithstanding said objection, the trial judge approved the question proposed by plaintiffs' counsel in toto.

The approved question was propounded by plaintiffs' counsel as a general question on voir dire in the form and content approved by the trial court with the single exception that it was slightly revamped by denominating Howard's insurance carrier as a "liability insurance company". Although counsel for Howard objected during voir dire to this modification of the previously approved question and moved that the jury be discharged (which the trial court overruled), Howard made no mention of this oblique reference to its insurance carrier as a "liability insurance company" in its motion for new trial. This procedural hiatus cannot be ignored on appeal and Howard's failure to raise the issue in its motion for new trial renders any alleged error associated therewith impotent on appeal. Rule 78.07, insofar as here pertinent, provides that "allegations of error to be preserved for appellate review must be included in a motion for a new trial . . .". Its enforcement at the appellate level is the rule rather than the exception, and properly so, because, otherwise, permitting belated charges of error, frequently the progeny of afterthought, to be raised for the first time on appeal effectively circumvents any opportunity for the trial judge, an impartial, firsthand observer, to reflect and objectively rule upon matters claimed to have adversely affected the outcome of a trial over which he presided after the din and pace of trial has subsided. The importance of giving trial judges an opportunity to initially pass upon claims of trial error, by virtue of their superior vantage point, cannot and should not be casually disregarded. See generally: *Oliver v. Bi–State Development Agency*, 494 S.W.2d 49, 52 (Mo.1973); and *Fowler v. S–H–S Motor Sales Corp.*, 560 S.W.2d 350, 357 (Mo.App.1977). Howard has not asked this court to review the matter as "plain error" under the auspices of Rule 78.08 and this court perceives no reason or justification for doing so sua sponte.[3]

---

3. Even if the matter had been preserved for appellate review, see *McCaffey v. St. Louis Public Service Co.*, 252 S.W.2d 361, 367 (Mo. banc 1952) [trial court did not abuse its discretion in refusing to discharge the jury where Transit Casualty Company was characterized on voir dire as an "insurance company"] and

*Hulahan v. Sheehan*, 522 S.W.2d 134, 144 (Mo. App.1975) [trial court did not abuse its discretion in refusing to discharge the jury where United States Fidelity and Guaranty Co. was characterized on voir dire as an "insurance company"].

Howard's allegation or error regarding counsel for plaintiffs' inquiry on voir dire as to whether any members of the jury panel were policyholders of Howard's insurance carrier was properly preserved for appellate review and presents a seldom encountered and vexing issue. Insofar as this court has been able to ascertain, and as disclosed by the respective briefs of the parties, this issue, in the precise context presented—inquiry as to whether any members of the jury panel were policyholders of a stock insurance company—has not heretofore been definitively addressed at the appellate level in this state. This is somewhat surprising, as cases are legion in this state concerning the propriety or impropriety, and the judicially circumscribed bounds, of questions on voir dire concerning the subject generally.

■ The following quote from *Morris v. Duker*, 414 S.W.2d 77, 79–80 (Mo.1967), sets forth certain threshold principles to initially look to for guidance and direction in resolving the narrow issue presently raised on appeal: "The extent to which counsel may go in inquiring of veniremen with respect to their connection with an insurance company interested in the outcome of a case on trial is a matter resting within the sound discretion of the trial judge. The court is allowed a broad discretion in determining the latitude of the inquiry respecting the qualifications of veniremen to sit as jurors. *Eickmann v. St. Louis Pub. Serv. Co.*, Mo.Sup., 323 S.W.2d 802, 807. The action of the court in this respect will not be set aside unless there is a manifest abuse of discretion. *Moore v. Middlewest Freightways, Inc.*, Mo.Sup., 266 S.W.2d 578, 585; *Kendall v. Prudential Insurance Company of America*, Mo.Sup., 327 S.W.2d 174; *Bunch v. Crader*, Mo.App., 369 S.W.2d 768[4] and cases cited, fn. 4. The burden is on appellant to establish prejudicial error upon an appeal, *Nash v. Plaza Electric, Inc.*, Mo.Sup., 363 S.W.2d 637, 641, and this rule applies to an order restricting the scope of

voir dire examination." Conversely, logic compels the conclusion that the burden to establish prejudicial error on appeal falls on one who claims error by reason of a trial judge's failure to properly circumscribe the scope of voir dire examination.

The insurance carrier interested in the outcome of the litigation in the *Morris* case was a nonassessable mutual insurance company and plaintiff's counsel was refused permission to inquire on voir dire whether any members of the jury panel were policyholders in said company. Plaintiff contended on appeal that the trial court abused its discretion by doing so. After quoting as follows from *Swinger v. Bell*, 373 S.W.2d 30, 32 (Mo.1963),[4] "[t]he fact alone of being a policyholder, however, does not disqualify . . . [a venireman]", the court in *Morris* held that the mere refusal to permit such inquiry did not constitute an abuse of discretion requiring the verdict and judgment adverse to plaintiff to be upset absent a showing that one or more of the jurors empaneled was a policyholder and that plaintiff was prejudiced by the trial court's ruling. Plaintiff failed to do so and the court held that he had not met the burden of establishing prejudicial error. As a proem to so holding the court in *Morris* stated, 414 S.W.2d at 81, as follows: "If the inquiry had been allowed it would have been proper. *McCollum*, supra [*McCollum v. Shubert*, 185 S.W.2d 48 (Mo.App.1944)]. The better practice would be to allow such an inquiry. If a venireman is a policyholder the plaintiff has a right to inquire whether in view of that fact he could try the case fairly. *McCollum*, supra."

■ The case of *Rodenberg v. Nickels*, 357 S.W.2d 551 (Mo.App.1962), is more directly in point. There the court held that the trial court did not abuse its discretion in permitting counsel for plaintiffs to inquire on voir dire, by means of five general questions, whether any members of the jury panel were *policyholders*, stockholders, present employees, past employees, or claim

---

4. A case involving a nonassessable mutual insurance company which was interested in the outcome of the litigation.

adjusters of a stock insurance company which was interested in the outcome of the case being tried. Counsel for defendant had objected on the grounds that the questions "were unnecessarily repetitious" and "prejudicial". Although no separate, definitive reasons were mentioned by the court in *Rodenberg* regarding the inquiry on voir dire as to policyholders, the case constitutes some precedential authority that it is not improper to inquire on voir dire whether any members of a jury panel are policyholders in a stock insurance company which is interested in the outcome of a case being tried.

▇▇▇ Howard also stresses an isolated incident that occurred during the voir dire examination conducted by counsel for plaintiffs which it contends further tainted the trial with the specter of insurance. In response to plaintiffs' counsel's inquiry to the jury panel about insurance, one venireman responded that he was a policyholder of Howard's insurance carrier. According to the record, counsel for plaintiffs then asked if he could approach the bench. The record is silent however as to what, if anything, was said or done by counsel for plaintiffs after he approached the bench. Nevertheless, at this juncture of the voir dire examination, counsel for Howard moved for a mistrial claiming that insurance had been prejudicially injected into the case by reason of the incident just mentioned. It is patently clear from the record that counsel for plaintiffs made no effort to challenge said venireman for cause. The record also discloses that counsel for plaintiffs then dropped all further inquiry about insurance, and more particularly, he did not pursue the subject of insurance with the single venireman who had said he was a policyholder of Howard's insurance carrier. As a matter of fact, counsel for plaintiffs, as previously noted, left the subject of insurance entirely, and thereafter proceeded to question the jury panel on relevant matters wholly unrelated to insurance. Howard attempts to characterize plaintiffs' counsel's approach to the bench as a subtle, insidious ploy to further inject insurance into the case. The record fails to support Howard in this re-

gard. The record, as might be expected, fails to reveal what went on in the mind of counsel for plaintiffs when he asked permission to approach the bench. One might fairly surmise that counsel for plaintiffs mistakenly contemplated challenging the venireman who was a policyholder of Howard's insurance carrier for cause, or that he contemplated making inquiry of the court as to whether he could individually question said venireman if the fact that he was a policyholder would prejudice him in any way. One might also fairly surmise that the fact that he did neither and dropped all further inquiry about insurance suggests that he may have concluded that he might be treading on dangerous grounds if he pursued the matter of insurance further. It is interesting to note that neither side spent any of its preemptory challenges to remove the venireman who was a policyholder and he sat as a petit juror. Howard is in no position to contend that his doing so inured to its prejudice because the policyholder–juror was one of the three jurors who refused to return a verdict in favor of plaintiffs.

▇▇▇ Policyholders in a nonassessable mutual insurance company are not subject to being challenged for cause. *Kendall v. Prudential Insurance Company of America*, 327 S.W.2d 174 (Mo. banc 1959); and *Swinger v. Bell, supra.* No Missouri cases have been cited or found holding that policyholders of a stock insurance company are subject to being challenged for cause and no valid reason comes to mind why they should be. It is plausible to assume that the amount of losses borne by both nonassessable mutual insurance companies and stock insurance companies are ultimately reflected to some degree in the cost of insurance obtained by either type of policyholder. As observed in *Bunch v. Crader*, 369 S.W.2d 768, 770–71 (Mo.App.1963), "the average insured juror realizes that claims against liability carriers furnish the premium basis, and that the greater the losses the higher the premiums." Concordantly, in the context just mentioned, any distinction between policyholders of a nonassessable

mutual insurance company and policyholders of a stock insurance company appears infinitesimal. If it is improper, as Howard contends, to question members of a jury panel as to whether they are policyholders of an interested stock insurance company, then logic and common sense suggests that it should also be improper to question members of a jury panel as to whether they are policyholders of an interested nonassessable mutual insurance company because an affirmative response in either instance does not constitute grounds for a challenge for cause. The trial judge who heard this case obviously concluded that the limited nature of the inquiry with respect to whether any members of the jury panel were policyholders of Howard's insurance carrier, a stock company, was not indicative of a bad faith effort on the part of counsel for plaintiffs to improperly taint the case with the presence of insurance and Howard has failed to carry the burden of showing that the trial court abused its discretion in permitting that particular line of inquiry. *Morris v. Duker, supra*; and *Rodenberg v. Nickels, supra.*

Judgment affirmed.

All concur.